## Estate of John P. Wilkinson, deceased. Appeal of Charles F. Cutler.

*Decedents' estates—Written obligation of decedent to his wife.*

Where a widow holds a plainly written obligation of her husband to herself in his own handwriting, against the integrity of which there is not the slightest suspicion, the paper furnishes its own explanation and she is under no duty of explanation in order to sustain her title to the obligation.

Where a check drawn by the decedent to the order of his wife is found among the papers of the wife after her and her husband's death, and was seen among her papers about a month after her husband's death, it will be presumed that the check was properly in the possession of the widow at the time of her death, and it will constitute a valid obligation in favor of her estate against her husband's estate.

Argued Feb. 7, 1899. Appeal, No. 353, Jan. T., 1898, by Charles F. Cutler, from decree of O. C. Chester Co., dismissing exceptions to auditor's report. Before STERRETT, C. J., GREEN, McCOLLUM, DEAN and FELL, JJ. Affirmed.

Exceptions to auditor's report.

The auditor's report, so far as it relates to the present appeal, is as follows :

The balance in bank to the credit of the individual account of John P. Wilkinson, at the time of his death, was $336.54; and there was in the house at the time of his death, $30.00. These last two sums were received by Hannah A. Wilkinson under the bequest to her.

John P. Wilkinson made his will dated February 8, 1894, and by said will in item 2 devised to his widow Hannah A. Wilkinson his undivided one-half interest in all the real estate in

Unionville he owned, "together with the household and kitchen furniture, including contents of the cellar, all provisions and all articles belonging to me in the house, my horse, two carriages, all my harness, cutter, stable furniture, hay, feed, feed chests, cutting box, chickens, all money in the house and bank or on hand at the time of my death. . . ."

The executor of Hannah A. Wilkinson, deceased, presented two claims against the estate of John P. Wilkinson, based upon the following papers:

"UNIONVILLE, PA., 8, 28, 1890.

"Borrowed and received of Hannah A. Wilkinson, four hundred and thirty-four and fifty hundredths dollars, and deposited in the F. N. B. of W. C., payable on demand.

"JOHN P. WILKINSON."

"WEST CHESTER, PA., 2, 10, 1894.

"The First National Bank of West Chester pay to Hannah A. Wilkinson, or order, six hundred dollars.

"$600.                       JOHN P. WILKINSON."

As to the first claim mentioned, the bank book of John P. Wilkinson and also his check book show that he deposited $434.50 in his bank account at or about the date of this demand note.    There is no evidence that the above note was ever paid or any part of it.    The representatives of John P. Wilkinson's estate set up the bar of the statute of limitations, contending that since the act of 1887,—the married woman's act,—Mrs. Wilkinson could have brought suit upon this claim against her husband at any time.    In Kennedy v. Knight, 174 Pa. 408, it is expressly decided that under the act of June 3, 1887, a married woman cannot bring suit against her husband.    This claim must therefore be allowed, with interest from the date of Mr. Wilkinson's death.

As to the check, a copy of which is given above, there is no evidence whatever outside of the check itself.    The books of John P. Wilkinson show nothing on the subject.    The check was never presented or paid by the bank.    The claim therefore stands simply upon the check itself.    The presumption is that a check is given in the payment of a debt or for cash received at the time: Baugher v. Conn, 1 Pa. C. C. R. 184; Flemming's

Ex'r v. McClain, 13 Pa. 177.    This claim must therefore be allowed with interest from the date of the death of Mr. Wilkinson.

The auditor's supplemental report was as follows:

At the request of the parties in interest, after the preparation of the foregoing report, meetings of the audit were held on July 14, 1898, and July 18, 1898, and testimony herewith reported, taken, and from the same and the books offered in evidence at the request of the parties, the auditor finds the following additional facts:

John P. Wilkinson died July 22, 1896, and letters testamentary on his estate were granted to Hannah A. Wilkinson on July 31, 1896, an inventory of his estate was taken August 6, 1896, and filed August 21, 1896.   Hannah A. Wilkinson died November 9, 1896, and letters on her estate were granted to David J. Chambers, November 18, 1896.   Inventory filed November 28, 1896.   On the stubs of the check book of John P. Wilkinson appear the following entries: "No. 1291, 4, 11, '90. Hannah A. Wilkinson going to Philadelphia for the day to buy furniture for Anna T. Lippincott.   $280."

Although this check appears to be dated 1890, by comparison with the stub in said check book immediately before and after this entry, this date should have been 4, 11, 1891.   In John P. Wilkinson's bank book a check is charged for $280 on April 13, 1891, which is evidently this check.   In the same check book appears the following entry: "No. 1292, 4, 17, '91, to H. A. Wilkinson in place of check No. 1290, see margin for check, leaving a balance due to check of No. 1290, of $46."   The check of $46.00 is charged in Mr. Wilkinson's bank book on April 18, 1891.   On the check No. 1290, referred to in this memorandum, appears the following entry: "No. 1290, 1, 7, '91.   Anna T. Lippincott, a wedding present, $50," and this $50.00 is crossed out.   Then occurs the following entry, evidently made at a different time: "This check is returned and I gave Hannah one in place to pay for part of Anna's outfit, which was a condition when I gave her check No. 1290.   Check to Hannah is No. 1202."   "5, 8, '91, check of H. A. Wilkinson to pay D. B. Pyle for furniture for Anna, $38."   This entry is on the margin of the check book opposite the stubs of checks drawn by John P. Wilkinson, indicating deposits made by John P. Wilkinson to his own credit in bank, and April 9, 1891, he has a

credit in bank for cash, $38.00, which is evidently this check. On the stub of his check book appears the following entry: "No. 1293, 6, 5, '91, David B. Pyle, furniture for Anna T. Chambers, $110." This check is charged in his bank account, 6, 26, 1891. On the same check book appears the following: "No. 1299, D. B. Pyle, $164." This check was produced, and is in evidence, having the indorsement of David B. Pyle, and marks of cancelation of the bank, but it does not appear as a charge in his bank book. On the stub of the same check book appears the following: "No. 1304, 5, 19, '92, H. A. Wilkinson loan, $20;" also the following: "No. 1310, 3, 13, '93, Hannah Wilkinson to pay for dress, $15." Also "1, 2, '94, R. H. Passmore Denton, taxes J. P. W.; J. Koemer due H. W., $18.35," which check was charged in his bank book, January 9, 1894. Also, "No. 1971, 2, 16, '95, Hannah A. Wilkinson got draft to send to Justin as a wedding present, $5." This check was charged in his bank book, 2, 18, 1895. All these entries are in the handwriting of John P. Wilkinson.

Anna T. Lippincott, mentioned in some of these memoranda, was a second cousin of Hannah A. Wilkinson, and went to live with John P. Wilkinson and Hannah A. Wilkinson when she was about three years old, and lived with them until her marriage on January 8, 1891. She will be thirty-one years of age in September, 1898. She removed from Mr. and Mrs. Wilkinson's after her marriage on April 1, 1891. Up to that time John P. Wilkinson, Hannah A. Wilkinson, Anna T. Lippincott, and a girl composed the family. John P. Wilkinson was her guardian for a small amount. She had no other estate but this fund, and was supported by John P. Wilkinson and Hannah all the time she remained with them. She is the sole legatee of Hannah A. Wilkinson, and her husband is the executor of Mrs. Wilkinson's estate. She was called as a witness before the auditor and her testimony was objected to on the ground of interest. Her testimony related to matters both before and after the death of John P. Wilkinson. It related to the possession of the note and check in question. In the opinion of the auditor she was incompetent to testify to any transaction before the death of John P. Wilkinson, but to anything after that she was competent. From so much of her testimony as is competent, the auditor finds the following facts:

After the death of John P. Wilkinson, at her home in Londongrove, and after Hannah had taken out letters on John P. Wilkinson's estate, the note and check in question were in the possession of Hannah A. Wilkinson in a pocket book which belonged to Hannah A. Wilkinson, in which she kept her money, coupons, etc. This was probably a month after the death of John P. Wilkinson. She next saw them some time afterwards at the office of Mr. Pierce, in the borough of West Chester, and they were then produced by Mrs. Wilkinson from the bank box in which Mrs. Wilkinson kept her private papers. Between the two dates when she saw these papers, Mrs. Wilkinson had been in West Chester on several occasions.

The counsel for the legatees under John P. Wilkinson's will asks that the auditor should find from the above stated memoranda of John P. Wilkinson of the dealings between him and his wife, and from the additional fact that he was abundantly able to pay the note and check in question, that they must be presumed paid. It seems to the auditor that it is impossible to find any facts from said memoranda bearing upon the payment of this claim; and the fact that Mr. Wilkinson was able to pay them would not justify the presumption that they were paid if the notes were still outstanding in the custody of his wife at the time of his death.

The facts found by the auditor in his report were that Mr. Wilkinson got a sum of money and deposited it to his credit in the bank at or about the time the demand note was given, of exactly the same amount as the note. It is fair to presume that these two items referred to the same transaction, although there is no evidence that shows what the deposit was made up of, which represented this money. As to the check, the check itself is evidence of indebtedness from the maker to the payee and implies that the maker owes that much money to the payee and that he has sufficient funds in bank to meet it: Sterrett v. Rosecrantz, 3 Phila. 54. The nonpresentment or delay in presenting the check does not excuse payment, although if the drawer suffers damages by the laches of the drawee such damages may defeat a recovery to that extent, yet if no damages arise, the drawer's liability continues until barred by the statute of limitations: 5 Am. & Eng. Ency. of Law, 528 z, 83. The drawer of a check may still be held liable thereon if he has suf-

fered no prejudice by reason of the delay in presentment and demand: Morse on Banks and Banking, 286. Prima facie, therefore, both the note and check are evidence of a liability on the part of the drawer, Mr. Wilkinson, to the payee, Mrs. Wilkinson, for the amount of the respective sums stated therein.

An additional reason is now suggested by the counsel for the legatees under John P. Wilkinson's will against the payment of these claims, on the ground that Mrs. Wilkinson, the payee, was also the executrix of John P. Wilkinson's estate, and that the presumption is that she found them among his papers, which would be evidence of their payment, and that the proof is upon her, or those representing her, in this controversy, to show that such was not the fact. In support of this contention, the cases of McGeary's Appeal, 5 Cent. Rep. 855; 6 Atl. Rep. 763, McMahon's Estate, 132 Pa. 175, and Hoffer's Estate, 156 Pa. 474, are cited. In McGeary's Appeal the facts were as follows: A. L. McGeary died November 21, 1880. His mother, Nancy McGeary, was appointed administrator of his estate. She died March 28, 1881. His brother, H. S. McGeary, was appointed administrator d. b. n. He died June 15, 1885. His administrator filed his account in the estate of A. L. McGeary, in which credit was claimed amongst other things, for a note dated May 18, 1876, payable in one year from date, $2,740; one paper dated March 26, 1877, $1,018.75; the value of fifty shares of Central Transportation stock called for in it, and $150, with interest; one half of G. B. Brown note; one due bill dated March 28, 1877, $3,162.50; on one dated June 12, 1877, $1,000; on note dated November 9, 1880, at thirty days, $500; on note dated October 7, 1880, at thirty days, $500; on note dated June 23, 1880, at thirty days, $500, and for $85.00 on three receipts for moneys alleged to have been collected by H. S. McGeary.

The court below, in disposing of the case, say: "Most of the other papers offered in evidence upon which credits are claimed as debts due by the decedent antedate his death from three to four years, and a majority of the transactions were of such a nature that the possibilities are they were settled in his lifetime. All of these papers were found in a wallet containing other valuable papers of H. S. McGeary, in his safe after his death,

but he may have come into possession of all except the note of $500, dated November 9, 1880, which matured after decedent's death, as his administrator. This possibility weakens the prima facie case made out by their possession. It seems also from the statements made by H. S. McGeary under oath, and the account filed by him, that the decedent was only indebted to him on a note for $250. In an answer filed on April 2, 1884, to a petition of a creditor praying that additional security be required of him as administrator, he averred 'that there are no creditors of said estate, all the debts having long since been paid in full.' On the 21st of the same month, he filed his account, and the only debt for which he claims credit as due to him is upon a note for $250. If the decedent had been indebted to him as now claimed, according to his statement under oath, the indebtedness had been paid before the account was filed, and he certainly would have claimed credit for it, as well as for the $250 note. The account was also regularly called on the argument list in June, 1884, and no claim was made or presented by H. S. McGeary as a creditor. The probabilities are that the decedent was the accommodation maker of the note which matured after his death. It should also be remarked in regard to the claim for the value of the fifty shares of Central Transportation stock, referred to in the paper dated March 26, 1877, that when the inventory was made out H. S. McGeary evidently claimed but forty shares of the stock standing in the decedent's name, and it was conceded him, which is persuasive evidence that the fifty shares had been accounted for. The weight of the evidence seems to be against the accountant as to the credits claimed for indebtedness due by the decedent to H. S. McGeary, except as to the G. B. Brown note, and with that exception they are not allowed." In McMahon's Estate, the note was signed by the mark of the executrix, who could neither read nor write, and its execution was not clearly and satisfactorily established. The executor, who presented the claim, and who was a competent witness to show its possession after the death of the testator, did not testify. Besides, in conversation with his coexecutor, relative to the debts of the decedent, soon after the death, he made no mention of the debt due to him. In disposing of the case, the judge in the court below, said: " The note in suit was presented by the accountant, who

as executor had control of the decedent's papers.   He offered it as an antagonist to the estate, which he represented, yet he did not show that this note had never left his own possession, nor that he did not find it among the decedent's effects.   In the latter case, of course, the presumption would be that the note had been paid.   He was legally entitled to the note as executor, and he was therefore doubly bound to show that he had it by another and hostile title.   At least, he should have informed his coexecutor of its existence, but the proof was that, although the two men had conversations with each other in respect to the debts of the estate, he never mentioned this note.   If anything also is needed to throw a doubt upon the honesty of his demand, it is found in the oaths of three witnesses, two of whom were apparently disinterested, that he had declared at the side of his mother's corpse, that the decedent had died owing nothing."   In Hoffer's Estate, the notes were allowed upon the testimony of the wife of the accountant, that the notes in question were in the custody of his wife immediately after his father's death, and were handed over to him by her.

In this case, Mrs. Wilkinson, to whom the papers were given, is dead, and consequently her possession of them cannot be explained by her; and all the evidence as to their possession is found in the testimony of Mrs. Chambers, who saw them twice, shortly after the death of John P. Wilkinson, in the possession of Mrs. Wilkinson, amongst her private papers.   Under these circumstances, does the rule laid down in the case first cited apply?   If so, it must be upon the theory that Mrs. Wilkinson committed a fraud upon her husband's estate and his legatees by abstracting these papers from his private effects and placing them among her own, in order that she might hold them as a claim against his estate.   This might be justifiable if she were here to explain her possession of the papers, as was the case first cited, but the case cited will not sustain the position of the counsel for the legatees of John P. Wilkinson, to the extent claimed.   The fair conclusion from them is as cited in the first case cited, that the possibility that the papers may have come into the accountant's possession as administrator weakens the prima facie case of their possession, and with other facts may negative the same altogether.   This would appear to be the rational rule.   It is to be presumed that accountants are honest

and will act in good faith towards the estate of the decedent. The accountant cannot testify as to possession of the evidence of indebtedness during the lifetime of the decedent, and in many cases would be without proof of the same, and he would only be competent to prove the possession after the death, and if he is so far regardless of his duty as to set up a claim against the estate upon obligations found among the decedent's effects, he would be reckless enough to swear to their possession as his own, after the death.

The fact that Mrs. Wilkinson had these notes amongst her private papers after John P. Wilkinson's death, was a claim of ownership to the note and check. If she had found them amongst her husband's papers and had transferred them to her private possession it would be a fraud upon his estate and upon the legatees. The auditor cannot draw such a conclusion in this case. John P. Wilkinson had confidence enough in her to make her his sole executrix, and there is nothing to show she was not worthy of that confidence; and if so, the conclusion would not be admissible that she began almost as soon as he was dead to take advantage of her position, and to violate the trust confided in her by abstracting from his papers the note and check in controversy and putting them with her own private papers to hold as claims against his estate.

The auditor, therefore, finds no occasion to change the conclusions arrived at in his former report.

*Error assigned* was in dismissing exceptions to auditor's report.

*William M. Hayes* and *J. Carroll Hayes*, for appellant, cited Cracken v. Miller, 4 W. & S. 102; McMahon's Est., 132 Pa. 175; Hoffer's Est., 156 Pa. 473; McGeary's App., 5 Cent. Rep. 855; Scott v. Reed, 153 Pa. 14; Darlington's Est., 147 Pa. 624; Hause v. Gilger, 52 Pa. 412; Hamill's App., 88 Pa. 363; Murphy v. Richardson, 33 Pa. 235; Connelly v. McKean, 64 Pa. 119; Rodgers v. Kichline, 28 Pa. 231.

*Thomas W. Pierce*, for appellee.

OPINION BY MR. JUSTICE GREEN, May 31, 1899:

The able and exhaustive report of the auditor in this case which was confirmed by the learned court below, contains a

full and correct review of all the facts and law applicable to the subject under consideration.   As the widow held two plainly written obligations of her husband in his own handwriting, against the integrity of neither of which there is the slightest suspicion, she was under no duty of explanation in order to sustain her title to them.   The papers furnished their own explanation.   One was a certificate of loan in the following words, "Unionville, Pa., 8, 28, 1890.   Borrowed and received of Hannah A. Wilkinson, four hundred and thirty-four and fifty hundredths dollars, and deposited in the F. N. B. of W. C. payable on demand.   John P. Wilkinson."   The auditor found upon the testimony that this identical amount was deposited by John P. Wilkinson in the First National Bank of West Chester, where he kept his account, at or about the date of this paper. And he also found that there was no evidence that he ever paid any part of it.   These findings were confirmed by the court below, and we are not now referred to any testimony showing or tending to show that this loan was ever paid.   We do not see how any other conclusion could have been reached.

The other obligation was a check in the following words :

"WEST CHESTER, PA. 2, 10, 1894.
"The First National Bank of West Chester pay to Hannah A Wilkinson, or order, Six hundred dollars."
                              "JOHN P. WILKINSON."

The auditor found that the check was never presented at the bank or paid.   It was found among the papers of Mrs. Wilkinson after her husband's death and her death.   It was shown by competent testimony that both the check and the note were seen among the widow's private papers, about a month after her husband's death.   It was therefore still a subsisting obligation at that time.   As to the suggestion that it might have been paid by the husband and retained by him until his death, and then that she might have taken possession of it and retained it for the purpose of making a false and dishonest claim for its payment a second time, it is only necessary to say that there is not the least fragment of testimony in support of such a theory, that it is in violent hostility to the natural course which would have been pursued if it had been really paid, to wit: by presentment and payment at the bank; and, lastly, that the theory

of the appellant can only be sustained by making a legal inference of fraud and dishonesty against the widow without any evidence to support it.   Such methods as this cannot possibly be sanctioned.   Another theory was that the check might have been given to pay the note.   But the trouble with this theory also is that it has no facts to support it.   The auditor has so fully and correctly dealt with the whole subject, his findings being confirmed by the court below, that we can add nothing to the reasons he has so well expressed for his conclusions. He has reviewed all the authorities cited with entire correctness as to his results, and we have no disposition to change them in any respect.   The assignments of error are all dismissed.

Decree affirmed and appeal dismissed at the cost of the appellant.